**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

JANE DOE, individually,

Plaintiff,

v.

AAA MID STATES, a Pennsylvania Non-Profit Corporation,

Defendant.

CIVIL ACTION

Case No:
Hon.

**INDIVIDUAL COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, Jane Doe, by and through her attorneys, Melmed Law Group P.C. for her Complaint against Defendant, AAA Mid States ("Defendant"), states as follows:

**PARTIES**

1. Plaintiff, Jane Doe ("Plaintiff"), is an individual who resides in Mechanicsburg, Pennsylvania and worked for Defendant at their office located in York, Pennsylvania.

2. Defendant AAA Mid States is a Pennsylvania Non-Profit Corporation.

3. Defendant owns and operates an American Automobile Association office location in York, Pennsylvania, that offers road-side assistance, insurance, trip planning, DMV services and customer service for members.

4. Defendant is registered to conduct business in the state of Pennsylvania, and its registered agent is listed as Leon Barber, 2840 Eastern Blvd., York, PA 17402.

**JURISDICTION AND VENUE**

5. This Court has original subject-matter jurisdiction over Plaintiff's claim arising under Title VII of the Civil Rights Act of 1964, 42 § U.S.C. § 2000e, et seq.

6. The Court also has supplemental jurisdiction over Plaintiff's claim arising under the Pennsylvania Humans Relations Act ("PHRA") pursuant to 28 U.S.C. § 1367 because Plaintiff's PHRA claim originates from the same facts that form the basis of her federal claim.

7. Venue lies in this District pursuant to 28 U.S.C. § 1391 because Defendant conducts business in this District and the events and conduct giving rise to the claims in this lawsuit occurred in in this District.

## GENERAL ALLEGATIONS

8. On March 3, 2025, Defendant hired Plaintiff as a Road Side Assistance Call Representative. As part of her offer for employment, Plaintiff was paid $23.00 per hour and worked on average 40 hours per week.

9. Plaintiff's job duties included taking customer calls for road side assistance and coordinating with drivers for these assistance calls. During Plaintiff's employment she received good performance reviews and met expectations related to her performance.

10. In approximately September of 2025, Defendant hired Tyler Smith ("Tyler") first as a Road Side Assistant, and Defendant promoted him to manager in approximately November 2025. Once Tyler was promoted to a manager at Plaintiff's location, with superiority over Plaintiff, Tyler's behavior began to change.

11. Starting in November of 2025, Tyler began making sexually inappropriate comments towards Plaintiff. Tyler began making comments such as, "I can show you what messy hair can do," referring to oral sex, would call Plaintiff "sexy" or "beautiful", and make comments that he hasn't "slept with his wife in forever." Tyler would also regularly describe him doing sexually explicit acts to Plaintiff and explain "what I would do to you" referring to what Tyler would sexually do to Plaintiff. Plaintiff would give Tyler a look of disgust when he made these

sexually inappropriate and harassing comments and would try to ignore him or change the conversation to something work related.

12. Within only a couple weeks Tyler began to escalate his sexual harassment and began sexually touching Plaintiff without her consent. Tyler began groping Plaintiffs' breasts and buttocks regularly. This occurred almost every shift that Tyler worked with Plaintiff. When Plaintiff's harassment first started, Plaintiff attempted to report Tyler to Human Resources. In the end of November 2025, Plaintiff reported Tyler's sexual comments and physical sexual harassment to Human Resources Representative Stephanie Behrens ("Stephanie"). In response Stephanie told Plaintiff that Defendant would "look into it." As far as Plaintiff is aware no investigation occurred, and Tyler faced no disciplinary action.

13. Tyler's sexual harassment of Plaintiff was not a secret to others working in the office. Other employees would witness Tyler make sexually inappropriate comments to Plaintiff and even would occasionally walk in on Tyler standing over Plaintiff and touching her over her clothes. In fact, Defendant's Vice President walked into the office on multiple occasions and witnessed Tyler standing over Plaintiff, brushing up against her, or in the act of touching her. Regardless, no one took any action to stop Tyler's sexual harassment of Plaintiff or discipline Tyler in any way.

14. Tyler's sexual harassment of Plaintiff increased in severity rapidly during this time. Tyler began asking Plaintiff to come into his office to retrieve documents or to "show her something" and would rub Plaintiff's legs and groin when no one was looking. At first Plaintiff attempted to smack his hands away or tried to only interact with him with other people around but Tyler's harassment did not stop.

15. In early December of 2025, Defendant called Plaintiff into the conference room, and when they were alone in the room, he grabbed her and kissed her, sticking his tongue in her mouth while groping her breasts. Plaintiff would physically try to push him away, but Defendant overpowered her and repeatedly stated "you know you want this" and "you know you like it" while Plaintiff repeatedly begged him to stop. Plaintiff repeatedly stated, "stop, stop, please someone is going to come and you'll get in trouble, stop."

16. After this incident Tyler began sending Plaintiff inappropriate sexual messages including "oh you know I'm going to make you make that sound multiple times" referencing the sound Plaintiff made while he was forcibly kissing her.

17. Tyler, as Plaintiff's supervisor, would threaten to reduce Plaintiff's overtime opportunities and deny her future PTO requests if she tried to physical fight Tyler off when he attempted to assault her. Male employees regularly were granted approval to work overtime hours but Plaintiff's request for overtime was only granted if she submitted to Tyler's sexual assault. If and when Plaintiff rejected or fought against Tyler's sexual assault and harassment her overtime would be denied.

18. Tyler would routinely act like he was showing Plaintiff a new role or policy when talking around coworkers as an excuse to get her into the conference room alone, but once they were alone in the conference or meeting room, he would sexually assault her by either kissing her or sexually penetrating her with his fingers. Tyler kissed Plaintiff approximately six times and penetrated her with his hands on multiple occasions between December of 2025 to January of 2026.

19. During this same time around late November to early December 2025, Defendant's Vice President instructed Plaintiff to go get catering for the office. While Plaintiff was getting the

catering she received a text from Tyler saying he needed to show her something and that he is waiting in his car, and to meet him at his car in the parking lot after 5:00 p.m.

20. Plaintiff entered Tyler's car and his penis was out of his pants. As soon as Plaintiff sat down, Tyler pushed her head down and forced his penis in Plaintiff's mouth while pushing her head downwards. During this Tyler exclaimed, "oh my God I can just imagine what it would be like if you go full throttle" while choking Plaintiff and thrusting his penis into her mouth. Plaintiff struggled and pushed away from Tyler. Plaintiff was finally able to push her face away from Tyler's penis and immediately exited the car. In response, Tyler immediately drove away.

21. Later that same evening Tyler sent Plaintiff nonconsensual photographs of his erect penis, and when Plaintiff did not respond, Tyler sent additional similar photographs the next day.

22. In approximately mid-December of 2025, Plaintiff was called into the conference room again by Tyler where they were alone. Tyler then removed her clothes, forcibly opened Plaintiff's legs, took his penis out, vaginally penetrated Plaintiff, and raped her. While raping Plaintiff, Tyler made comments such as, "I just want to enter you," "I just wanted to feel your pussy," and "I just want to put in the tip." Plaintiff, afraid for her job and in shock, froze and stayed quiet. Tyler then ejaculated, zipped up his pants, and walked out of the conference room without saying anything to Plaintiff. That very next day Plaintiff attempted to commit suicide.

23. Tyler raped Plaintiff in this matter again a few weeks later in the end of December of 2025. The very next day, Plaintiff attempted to commit suicide for a second time.

24. During the beginning of her employment with Tyler, Plaintiff would arrive for her shift at 3:00 p.m. and Tyler would end his shift around 5:00 p.m., creating only a 2-to-3-hour window where Plaintiff was sexually harassed by Tyler. In approximately the beginning of January of 2025 Tyler changed his shift to match Plaintiff's schedule, and Plaintiff was forced to endure

this sexual harassment for her full 8-hour shift. This also made Tyler Plaintiff's direct supervisor. At this point Plaintiff was heavily depressed and suicidal due to the extreme and pervasive sexual harassment she was facing on an almost daily basis.

25. Plaintiff told Tyler numerous times from November of 2025 to January of 2026 that she would report him to the Vice President for sexual harassment, but any time Plaintiff would tell Tyler she was going to report him he would immediately physically assault her while stating, "don't do that I could lose my job and get in a lot of trouble." Tyler made it very clear that if Plaintiff reported his harassment it would result in increased harassment and sexual assault.

26. The last time Plaintiff told Tyler she would report him, she threatened to tell the CEO, Tyler stared Plaintiff down, grabbed her, and forcibly kissed her. Plaintiff could not escape and he only stopped to state, "what can I do to make you feel better" while promising to stop touching her if she did not report him to the CEO. Regardless of his promises, Tyler's sexual harassment of Plaintiff continued.

27. Plaintiff again attempted to report Tyler to Human Resources on two other occasions in January of 2026. Plaintiff requested that Stephanie set up a meeting with the CEO after Human Resources refused to investigate or discipline Tyler, but Stephanie refused, telling Plaintiff to "google him" if Plaintiff wanted to set up a meeting with the CEO. During the second January meeting, Plaintiff informed Stephanie that Tyler had raped her on multiple occasions. Stephanie's response was, "if that was true then call the police." Again, Defendant did nothing.

28. Around late January of 2026, Plaintiff informed Shyrah Last Name Unknown ("Shyrah"), a male co-worker, about the sexual harassment committed by Tyler against Plaintiff and that Plaintiff was going to report him to the CEO since human resources did not take her

reports seriously. Shyrah's callous response was for Plaintiff not to report Tyler until after Tyler had approved Shyrah's PTO request.

29. Plaintiff a few days later scheduled a meeting with Defendant's CEO to report Tyler. Plaintiff subsequently requested approval from Tyler for PTO. When Tyler asked Plaintiff the reason for her PTO request, Plaintiff, in fear of retaliation and to avoid Tyler from finding out about her meeting with the CEO, told Tyler it was because she was sick. Tyler then told Plaintiff that her PTO request was approved.

30. When Plaintiff returned to work, Tyler informed Plaintiff that he had forgotten to enter Plaintiff's PTO request, and instructed Plaintiff to enter it in the system that day and he would retroactively approve it. Plaintiff believes and upon such a belief alleges that Tyler was told by Shyrah that she was going to report him to the CEO and that Tyler instructed Plaintiff to retroactively input the PTO because he knew doing so went against company policy. Tyler subsequently used this violation to terminate Plaintiff before she could speak with the CEO to report his sexual harassment.

31. That same day, Plaintiff was called into human resources, where Stephanie informed her that Tyler had reported her for a "no-call-no-show" for her days off that Tyler told her that he had approved. When Plaintiff tried to explain the situation, Stephanie stated that since the PTO was a lie, and because it was retroactively entered which was in violation of company policy, Plaintiff would be terminated regardless. During this meeting Plaintiff showed Stephanie multiple messages showing text messages from Tyler on January 19, 2026 and January 20, 2026 showing that Tyler approved the PTO request. Plaintiff also showed Stephanie the sexually explicit and non-consensual texts and photos Tyler sent her. Stephanie refused to address the reports of

sexual harassment but instead terminated Plaintiff for the "no-call-no-shows" and retroactive entering of PTO.

32. After Plaintiff was terminated Plaintiff called the CEO and left a voicemail explaining that she had been sexually harassed and that the reason for termination was pretextual. Stephanie reached out stating she had been forwarded the voicemail from the CEO and had her speak with an investigator. Plaintiff never heard back from Defendant about the result from the investigation, and her job was never reinstated.

33. Unfortunately, the effects of Tyler's sexual assault continue to deeply impact Plaintiff's daily life and emotional well-being. As a result of Tyler's misconduct and Defendant's failure to prevent such conduct, Plaintiff continues to suffer from anxiety, depression, and emotional trauma.

34. On or about July 20, 2026, Plaintiff filed a charge of employment discrimination, harassment, and retaliation against Defendant with the U.S. Equal Employment Opportunity Commission (Charge No. 530-2026-08368).

35. On July 24, 2026, the EEOC issued a Notice of Right to Sue letter to Plaintiff. This Complaint is timely filed within the 90-day period.

## COUNT I: VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. §2000e, *et seq.* – SEXUAL HARASSMENT AND QUID PRO QUO SEXUAL HARASSMENT

36. Plaintiff incorporates by reference all prior paragraphs herein.

37. At all relevant times, Defendant was Plaintiff's "employer" as defined by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b) ("Title VII").

38. Plaintiff is a member of the classes of individuals protected by Title VII. 42 U.S.C. §200e(f); 42 U.S.C. § 2000e-2(a)(1).

39. At all relevant times, Defendant had a duty under Title VII not to discriminate against Plaintiff, including a duty to provide a work environment free from sexual harassment.

40. Plaintiff was repeatedly subjected to egregious and sexually harassing conduct by Tyler during her employment.

41. The sexual harassment included, but was not limited to, daily unwelcome sexual comments directed at Plaintiff, purposeful and unwanted exposure of Tyler's genitals, comments and conduct of an offensive and sexual nature directed at Plaintiff, offensive and sexual texts which included nude photos of Tyler's genitals, unwanted touching of Plaintiff, multiple separate sexual assaults—which escalated into Plaintiff being raped on multiple occasions, and the creation of a hostile work environment.

42. The sexual harassment substantially interfered with Plaintiff's employment with Defendant.

43. Plaintiff felt she had no choice but to submit to the sexual harassment to avoid her overtime hours and PTO being cut, and to ensure she was not terminated.

44. Defendant violated Plaintiff's civil rights under Title VII by subjecting her to unwelcome, offensive, and sexually harassing conduct that was perpetrated upon Plaintiff by Tyler.

45. Despite Defendant having knowledge of the sexual harassment, Defendant failed to appropriately remedy the harassment.

46. Defendant violated Plaintiff's civil rights under Title VII in ways which included, but were not limited to, the following:

a. Subjecting Plaintiff to a pattern and practice of sexual harassment resulting in a hostile work environment.

b. Failing to take prompt and corrective action to address Plaintiff's repeated complaints about sexual harassment.

c. Failing to follow its corporate policies and procedures including, but not limited to, progressive discipline policy, non-retaliation and non-discrimination policies.

d. Wrongfully terminating her employment.

e. Other acts and/or omissions that may become known during discovery.

47. As a direct and proximate result of Defendant's violations of Title VII, Plaintiff suffered damages including but not limited to, loss of compensation and fringe benefits, non-economic damages for mental and emotional distress, and attorney fees and costs.

**COUNT II:**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**
**42 U.S.C. §2000e, *et seq.* – HOSTILE WORK ENVIRONMENT**

48. Plaintiff incorporates by reference all prior paragraphs herein.

49. At all relevant times, Defendant was Plaintiff's "employer" as defined by Title VII.

50. Plaintiff is a member of the classes of individuals protected by Title VII. 42 U.S.C. §200e(f); 42 U.S.C. § 2000e-2(a)(1).

51. At all relevant times, Defendant had a duty under Title VII not to discriminate against Plaintiff, including a duty to provide a work environment free from sexual harassment.

52. Plaintiff was repeatedly subjected to egregious and sexually harassing conduct by Tyler during her employment.

53. Plaintiff faced such severe and pervasive harassment during her employment with Defendant that it made her working conditions unbearable and created an abusive working environment.

54. As a direct and proximate result of Defendant's violations of Title VII, Plaintiff suffered damages including but not limited to, loss of compensation and fringe benefits, non-economic damages for mental and emotional distress, and attorney fees and costs.

**COUNT III:**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**
**42 U.S.C. §2000e, *et seq*. – RETALIATION**

55. Plaintiff incorporates by reference all prior paragraphs herein.

56. At all relevant times, Defendant was Plaintiff's "employer" as defined by Title VII.

57. Plaintiff is a member of the classes of individuals protected by Title VII. 42 U.S.C. §200e(f); 42 U.S.C. § 2000e-2(a)(1).

58. At all relevant times, Defendant had a duty under Title VII not to discriminate against Plaintiff, including a duty to provide a work environment free from sexual harassment. Defendant also had a duty under Title VII not to retaliate against Plaintiff for reporting or attempting to report sexual harassment.

59. As a direct and proximate result of Plaintiff threatening to report Tyler's sexual harassment, her overtime hours were reduced, and her PTO was regularly denied. This retaliation ultimately resulted in Plaintiff being wrongfully terminated in retaliation for scheduling a meeting with the CEO to report Tylers sexual harassment. Even after Plaintiff had previously reported Tylers harassment and assault to Human Resources, and after Plaintiff explained what occurred with her PTO request to Human Resources, she was ignored and terminated based on the accusations made by her harasser. This was done intentionally by Tyler to get Plaintiff terminated before she could report him to some above Human Resources.

60. As a direct and proximate result of Defendant's violations of Title VII, Plaintiff suffered damages including but not limited to, loss of compensation and fringe benefits, non-economic damages for mental and emotional distress, and attorney fees and costs.

**COUNT IV:**
**VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT, 43 P.S.§ 951, *et. seq.* – SEXUAL HARASSMENT**

61. Plaintiff incorporates by reference all prior paragraphs herein.

62. Defendant was Plaintiff's employer as defined by the Pennsylvania Human Relations Act, 43 P.S. § 951, *et. seq.* ("PHRA").

63. The PHRA provides: "For any employer because of the . . .sex. . . of any individual or independent contractor, to . . . to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract . . ." PHRA § 955 Section 5(a).

64. At all relevant times, Defendant had a duty under the PHRA not to discriminate against Plaintiff, including a duty to provide a work environment free from sexual harassment.

65. Plaintiff was repeatedly subjected to egregious and sexually harassing conduct by Tyler during her employment.

66. The sexual harassment included, but was not limited to, unwelcome comments directed at Plaintiff, sexual and non-consensual texts and photos, purposeful and unwanted exposure of Tyler's genitals, unwanted touching of Plaintiff's buttocks, genitals, thighs, and breasts, multiple separate sexual assaults—including multiple incidents of rape—, and the creation of a hostile work environment.

67. The sexual harassment substantially interfered with Plaintiff's employment with Defendant.

68. Defendant violated Plaintiff's civil rights under the PHRA by subjecting her to unwelcome, offensive, and sexually harassing conduct that was perpetrated upon Plaintiff by Tyler.

69. Despite Defendant having knowledge of the sexual harassment, Defendant failed to appropriately remedy the harassment.

70. Defendant violated Plaintiff's civil rights under the PHRA in ways which included, but were not limited to, the following:

a. Subjecting Plaintiff to a pattern and practice of sexual harassment resulting in a hostile work environment.

b. Failing to take prompt and corrective action to address Plaintiff's repeated complaints about sexual harassment.

c. Failing to follow its corporate policies and procedures including, but not limited to, progressive discipline policy, non-retaliation and non-discrimination policies.

d. Wrongfully terminating her employment.

e. Other acts and/or omissions that may become known during discovery.

71. As a direct and proximate result of Defendant's violations of the PHRA, Plaintiff suffered damages including but not limited to, loss of compensation and fringe benefits, non-economic damages for mental and emotional distress, and attorney fees and costs.

**WHEREFORE**, Plaintiff requests that this Court enter a Judgement in her favor and award a monetary judgement for consequential and incidental damages including, but not limited to, back pay, front pay, fringe benefits, damages for emotional and mental distress, and attorney fees and costs.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury on all issues in this Complaint that are so triable as a matter of right.

Date: October 14, 2026

Respectfully submitted,

*Meghan Barlow*

Meghan Barlow (PA No.332908) (CA No: 334626)
**MELMED LAW GROUP, P.C.**
1801 Century Park East, Suite 850
Los Angeles, CA 90067
(310) 824-3828
meghan.barlow@melmedlaw.com

*Attorneys for Plaintiff*